**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**MASTER GROUP GLOBAL CO., LIMITED,**

<table>
<tr><td></td><td align="center">Plaintiff,</td><td>REPORT AND<br>RECOMMENDATION</td></tr>
<tr><td>-against-</td><td></td><td></td></tr>
<tr><td></td><td></td><td>19-CV-6648 (AMD)</td></tr>
<tr><td>TONER.COM INC.,</td><td></td><td></td></tr>
<tr><td></td><td align="center">Defendant.</td><td></td></tr>
</table>

-----------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Master Group Global Co., Limited ("Master Group" or "plaintiff") commenced this diversity action against defendant Toner.Com Inc. ("Toner" or "defendant") on November 25, 2019, alleging three causes of action: breach of contract; goods sold and delivered, pursuant to the New York Uniform Commercial Code ("NYUCC"); and account stated.   See generally Complaint (Nov. 25, 2019) ("Compl."), Electronic Case Filing ("ECF") Docket Entry ("DE") #1.[1]   Currently pending before this Court, on a referral from the Honorable Ann M. Donnelly, is Master Group's March 9, 2020 motion for default judgment, see Referral Order (Mar. 9, 2020); Notice of Motion for Default Judgment (Mar. 9, 2020), DE #8; see also Memorandum of Law in Support of Plaintiff's Motion for Default Judgment (Mar. 9, 2020) ("Pl. Mem."), DE #8-17.   For the reasons that follow, this Court respectfully recommends that plaintiff's motion for default judgment be granted in part and denied in part, and that plaintiff be awarded damages as set forth

---

[1] The caption of the Complaint erroneously refers to multiple "[d]efendants," and the pleading's jurisdictional and venue allegations mention two defendants – Toner and Streicher.   See Compl. ¶¶ 7-8. Nonetheless, viewed in its entirety, the Complaint makes clear that plaintiff intended to name only one defendant, Toner.   In addition, the first paragraph of the Complaint references quantum meruit, see id. ¶ 1, but no cause of action for a quantum meruit claim is set forth in the Complaint.   As noted throughout this opinion, plaintiff's pleading and other submissions reflect a multitude of other errors.

below.

## **BACKGROUND**

Master Group is a Hong Kong-based international manufacturer and supplier of elite kitchen cookware.   See Compl. ¶¶ 4-5; Declaration of Angela Zhao (Mar. 9, 2020) ("Zhao Decl.") ¶¶ 3-4, DE # 8-3.   Toner is a corporation incorporated in the State of New York with its principal place of business in Brooklyn, New York.   See Compl. ¶ 6; Zhao Decl. ¶ 5. According to the allegations set forth in plaintiff's Complaint, Toner began purchasing special order kitchenware and equipment from Master Group in 2013, all of which were shipped from Hong Kong to New York.   See Compl. ¶ 10.   The orders placed between 2013 and 2018 totaled $3,107,891.53, and, until the transactions at issue in this suit, Toner paid in full for each order. See Supplemental Declaration of Angela Zhao (July 15, 2020) ("Supp. Zhao Decl.") ¶ 6, DE #14.   As is detailed below, the trouble began between 2017 and 2018, when the parties entered into a series of four sales contracts (collectively, the "Four Contracts") and a debit note (the "Debit Note") for Toner's purchase of cookware, for which there remains a balance owed to Master in the sum of $507,215.14, together with late fees accruing daily on a portion of the total sum owed, at a rate of 0.01 percent.   See generally Compl.; Zhao Decl. ¶ 10.[2]

### 1. **First Contract**

In or around August 2018, the parties entered into Sales Contract No. SC18081501 (the "First Contract"), which provided for the purchase of 864 sets of cookware, each set consisting of 17 pieces of cookware, manufactured by Master Group to Toner's specifications, for a total

---

[2] For the sake of convenience, the following summary of the Four Contracts and the Debit Note lists the transactions in the order in which they are recounted in the Complaint, rather than in chronological order according to their respective dates of execution.   See Compl. ¶¶ 12-75.

cost of $77,829.12.   See Compl. ¶ 12; Ex. G to Zhao Decl. (First Contract), DE # 8-10.[3]

Pursuant to the terms of the First Contract, Toner agreed to pay a deposit of 30 percent of the

cost of the cookware (or $23,348.74) prior to its production, with the remaining balance (or

$54,480.38) "to be paid within 15[] days when container were [sic] on board" the shipping

carrier.   See Compl. ¶ 13; First Contract at ECF p. 1.   On or about August 16, 2018, Toner paid

the 30 percent deposit totaling $23,348.74, see Compl. ¶ 14; and on November 13, 2018, the

cookware was shipped to Toner, see id. ¶ 16.   Master Group subsequently notified Toner of this

shipment and demanded payment of the outstanding balance totaling $54,480.38.   See id. ¶ 17.[4]

On or about November 21, 2018, Master Group again contacted Toner to inform it that the

shipment had arrived in Brooklyn, and again demanded payment.   See id. ¶ 18.   Toner neither

responded to Master Group's communication nor paid any portion of the balance due under the

First Contract.   See id. ¶ 19.

### 2. Second Contract

Meanwhile, on or about September 22, 2018, Toner emailed Master Group seeking a

purchase invoice for 1,728 sets of cookware, each set consisting of 17 pieces of cookware,

manufactured by Master Group to Toner's specifications, at a total price of $155,658.24.   See

Compl. ¶ 25.   On or about September 26, 2018, Toner paid a 20 percent deposit on the balance

---

[3] The First Contract displays the wrong date – day and year – on its first page.   According to Angela Zhao, Master Group's Sales Executive since 2012, the correct contract date is August 15, 2018.   See Supp. Zhao Decl. ¶¶ 2, 12.   Additionally, that contract lists an incorrect arrival date of November 26, 2017 under the "Remarks" section of the Contract.   See id. ¶ 12.

[4] Plaintiff has proffered copies of the bill of lading, a commercial invoice, and the packing list.   See Ex. H to Zhao Decl. (First Contract Shipment Documents), DE #8-11.   The commercial invoice and packing list reflect additional cookware items that were shipped with the purchased goods, free of charge.   See id. at ECF pp. 3-4.

due (or $31,131.66).   See id. ¶ 26.   The parties subsequently entered into Sales Contract No.

SC18021201 (the "Second Contract") on November 13, 2018, which formalized the terms of the

purchase invoice, including the balance of the payment due "against the copy of BL."[5]   See id.

¶¶ 27-29; Ex. I to Zhao Decl. (Second Contract) at ECF p. 1, DE #8-12.[6]   On December 9, 2018,

the cookware was shipped to Toner.   See Compl. ¶ 30.   Master Group subsequently notified

Toner of the shipment and demanded payment of the remaining balance (or $124,526.59).   See

id. ¶ 31.[7]   Master Group again contacted Toner to inform it that the shipment had arrived, and

again demanded payment.   See id. ¶ 32.   Toner neither responded to Master Group's

communication nor paid any portion of the balance due under the Second Contract. See id. ¶ 33.

### 3.  Third Contract

Earlier in the year, on May 9, 2018, the parties entered into Sales Contract No.

SC18042503 (the "Third Contract"), which provided for the purchase of 24,000 sets of giftboxes,

each consisting of a milk frother with a big spout and cleaning brush, for a total cost of

$338,400.00.[8]   See Compl. ¶ 39; Ex. E to Zhao Decl. (Third Contract), DE #8-8.   Pursuant to

the terms of the Third Contract, Toner agreed to pay Master Group a 20 percent deposit of the

---

[5] The BL, or bill of lading, "is a document normally issued by [a] shipowner when goods are loaded on its ship, and may, depending on the circumstances, serve as a receipt, a document of title, a contract for the carriage of goods, or all of the above."   Asoma Corp. v. SK Shipping Co., Ltd., 467 F.3d 817, 823 (2d Cir. 2006) (citation omitted).

[6] The Second Contract was inadvertently dated November 13, 2017, rather than the correct date of November 13, 2018.   See Zhao Decl. ¶ 26 n.2.

[7] Plaintiff has proffered copies of the bill of lading, a commercial invoice, and the packing lists.   See Ex. J to Zhao Decl. (Second Contract Shipment Documents), DE #8-13.   The packing lists reflect additional cookware items that were shipped, free of charge.   See id. at ECF pp. 4-5.

[8] The Third Contract was inadvertently dated April 25, 2018, rather than the correct date of May 9, 2018. See Zhao Supp. Decl. ¶ 11.

cost of the giftboxes prior to their production, and the remaining balance against a copy of the bill of lading showing that the cookware items were on board the shipping carrier.  See Supp. Zhao Decl. ¶ 11.  The goods were produced and shipped in two batches of 12,000 sets of giftboxes.  See Compl. ¶ 41.  Toner paid $169,200.00 in connection with the first batch of boxes, which were shipped to, and accepted by, Toner.  See id. ¶¶ 42-43.  As to the remaining batch of 12,000 sets of giftboxes, on or about May 16, 2018, Toner paid a 20 percent deposit (or $33,840.00), leaving a balance due of $135,360.00, which Master Group represents was reduced thereafter to $105,722.80 after Master Group applied a $29,637.20 credit to Toner's balance. See id. ¶¶ 44-45.[9]  Master Group subsequently notified Toner of the shipment of the remaining giftboxes, and demanded payment of the remaining balance (or $105,722.80).  See id. ¶ 48; Ex. 4 to Supp. Zhao Decl., DE #14-4 at ECF pp. 3-4.[10]  Master Group again contacted Toner to inform it that the shipment had arrived, and again demanded payment.  See id. ¶ 49.  Toner neither responded to Master Group's communication nor paid any portion of the balance due under the Second Contract. See id. ¶ 50.

### 4. Fourth Contract

On or about September 26, 2018, the parties entered into Sales Contract No. SC17111707 (the "Fourth Contract"), which provided for Toner's purchase of 3,744 sets of cookware, each set

---

[9] According to Ms. Zhao, although the Second Contract provides for a 15 percent deposit, Toner paid a 20 percent deposit (and, in return, received a five percent credit).  See Supp. Zhao Decl. ¶ 13.  That credit appears to have been applied to the remaining balance owed under the Third Contract, not the Second Contract.

[10] Plaintiff has proffered copies of the bill of lading, a commercial invoice, and the packing list for the second shipment.  See Ex. F to Zhao Decl. (Third Contract Shipment Documents), DE #8-9.  The commercial invoice does not reflect the $29,637.20 credit applied to Toner's balance.  See id. at ECF p. 2.

consisting of a giftbox of 14 pieces of stainless-steel cookware manufactured by Master Group to Toner's specifications, at a total cost of $276,606.72.   See Compl. ¶ 56; Ex. K to Zhao Decl. (Fourth Contract), DE # 8-14.   According to the Fourth Contract, Toner was to pay a 20 percent deposit of the cost of the cookware (or $55,321.35) prior to its production, with the remaining balance (or $221,285.37) due within 15 days of receipt of a copy of the bill of lading showing that the cookware was on board the shipping carrier.   See Compl. ¶ 57.   Toner paid the 20 percent deposit on September 26, 2018, see id. ¶ 58, and the cookware was shipped to Toner on December 9, 2018, see id. ¶ 60.   Master Group subsequently notified Toner of the shipment of the cookware, and demanded payment of the balance due (or $221,285.37).   See id. ¶ 61.[11] Master Group again contacted Toner to inform it that the shipment had arrived, and again demanded payment.   See id. ¶ 62.   Toner neither responded to Master Group's communication nor paid any portion of the balance due under the Fourth Contract. See id. ¶ 63.

### 5. Debit Note

The earliest transaction at issue in this case occurred on July 10, 2017, when Toner purchased from Master Group, pursuant to Debit Note GDN-032/17 (the "Debit Note"), 4000 whisks,[12] as spare parts for an earlier order of milk frothers, at $1,200.00.   See Compl. ¶ 69;

---

[11] Plaintiff has proffered copies of the bill of lading, a commercial invoice, and the packing lists.   See Ex. L to Zhao Decl. (Fourth Contract Shipment Documents), DE #8-15.   The invoice and packing lists reflect additional items that were shipped, free of charge.   See id. at ECF pp. 2-6.

[12] The record is not clear as to the precise number of whisks purchased pursuant to the Debit Note. While the Complaint states that Toner purchased 4,000 whisks from Master Group, see Compl. ¶ 69; Ex. D to Zhao Decl. (Debit Note), DE #8-7, email correspondence attached to Ms. Zhao's supplemental declaration indicates that the number of whisks purchased by Toner totaled "1,000 sets," Ex. 3 to Supp. Zhao Decl., DE #14-3 at ECF pp. 1, 3.   The Debit Note itself lists a quantity of "4000 sets."   Debit Note. Based on the information submitted, the Court presumes that each set consisted of four whisks, and that the Debit Note erroneously lists the number of sets of whisks as 4,000 (rather than 1,000 sets comprised of four individual whisks).

Debit Note.[13]   Master Group shipped these whisks to Toner on August 31, 2017, see Compl. ¶ 70, and Toner took possession of the goods, but did not pay any portion of the balance due under the Debit Note, see id. ¶¶ 71-72; see also Ex. M to Zhao Decl. (Emailed Statement of Accounting), DE #8-16 at ECF p. 1; Ex. 4 to Supp. Zhao Decl., DE #14-4 at ECF pp. 22-23.

In light of the foregoing Four Contracts and Debit Note, on January 26, 2019, and on several other occasions, Master Group sent Toner a Statement of Account via electronic mail, reflecting the balances due under these agreements and demanding payment of the aggregate amount, $507,215.14.   See Compl. ¶ 78; see also Ex. M to Zhao Decl. (Emailed Statement of Accounting), DE #8-16; Exs. 1-4 to Supp. Zhao Decl. at ECF pp. 12-49, DE #14-1, #14-2, #14-3, #14-4.   The Complaint alleges that although Toner acknowledged the open balance to Master Group and promised to pay the monies owed, Toner has failed to remit any part of the open balance.   See Compl. ¶¶ 79-80.

## PROCEDURAL HISTORY

Plaintiff commenced this action on November 25, 2019.   See Compl.   Defendant was timely served with process on December 3, 2019, via the New York Secretary of State's Office, see Summons Returned Executed (Dec. 17, 2019), DE #5, and, after defendant failed to file an answer, the Clerk of the Court issued an Entry of Default on January 17, 2020, see Entry of Default (Jan. 17, 2020), DE #7.   On March 9, 2020, plaintiff moved for default judgment pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure ("FRCP"), see Notice of

---

[13] The Complaint states that the purchase of these whisks occurred in June 2017, see Compl. ¶ 69, while the Debit Note is dated July 10, 2017, see Debit Note.   Ms. Zhao addresses this discrepancy in her supplemental declaration, averring (1) that the correct transaction date was July 10, 2017, and (2) that she "mistakenly noted June 10, 2017 as the transaction date" when "preparing a summary of the open balances owed by Toner[,]" which was then erroneously incorporated into the Complaint.   See Supp. Zhao Decl. ¶ 5 n.1.

Motion for Default Judgment, and that same day, the Honorable Ann M. Donnelly referred the pending motion to the undersigned magistrate judge for preparation of a report and recommendation, see Referral Order.   As of the date of this opinion, defendant has neither responded to the Complaint nor otherwise appeared in this action.

On June 24, 2020, after reviewing plaintiff's default judgment papers, this Court issued a detailed Memorandum and Order, concluding that the submission lacked sufficient information upon which to prepare a report and recommendation.   See generally Memorandum and Order (June 24, 2020) ("6/24/20 M&O"), DE #11.   The Court ordered plaintiff to submit a supplemental brief addressing specific issues.   See id.   Master Group timely filed its supplemental submission on July 15, 2020, which consisted of a 27-page memorandum of law, see Supplemental Memorandum of Law in Support of Plaintiff's Motion for Default Judgment (July 15, 2020) ("Pl. Supp. Mem."), DE #16; a second declaration, with exhibits, from Angela Zhao, Master Group's Sales Executive, see Supp. Zhao Decl., DE # 14; and nearly 700 pages of Hong Kong legal authorities, see Hong Kong Legal Authorities (July 15, 2020), DE #15-1; Additional Hong Kong Legal Authorities (July 21, 2020), DE #18-1.

## DISCUSSION

After the Clerk of the Court enters a Certificate of Default, the District Court may, on application, enter a default judgment if a defendant "has failed to plead or otherwise defend" an action.   See Fed. R. Civ. P. 55(a)-(b); see also S.D.N.Y./E.D.N.Y. Local Civ. R. 55.2(a)-(b). "A defendant's default is an admission of all well-pleaded factual allegations in the complaint except those relating to damages."   Lyons P'ship, L.P. v. D & L Amusement & Entm't, Inc., 702 F.Supp.2d 104, 111 (E.D.N.Y. 2010) (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L.

Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992)); see also Fed. R. Civ. P. 8(b)(6).   The plaintiff

bears the burden of establishing damages, see Greyhound Exhibitgroup, 973 F.2d at 158, which

the court must "ascertain . . . with reasonable certainty[,]" Credit Lyonnais Secs. (USA), Inc. v.

Alcantara, 183 F.3d 151, 155 (2d Cir. 1999), either by evaluating affidavits or documentary

evidence, see Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989), or, in its

discretion, by holding an evidentiary hearing, see, e.g., Action S.A. v. Marc Rich & Co., Inc.,

951 F.2d 504, 508 (2d Cir. 1991).

## I.    Sufficiency of Service

"A default judgment is ordinarily justified where a defendant fails to respond to the

complaint."   SEC v. Anticevic, No. 05 CV 6691(KMW), 2009 WL 4250508, at *2 (S.D.N.Y.

Nov. 30, 2009) (citing, *inter alia*, Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir. 1984)).   Before

entering a default judgment, the Court should confirm that defendant was duly served and

notified of this lawsuit.   See LG Capital Funding, LLC v. Volt Solar Sys., Inc., 15 Civ. 1404

(KAM) (VMS), 2016 WL 11447845, at *4 (E.D.N.Y. Aug. 15, 2016), adopted, 2016 WL

4718014 (E.D.N.Y. Sept. 9, 2016).

Rule 4 of the FRCP permits service of a corporation in a manner authorized by the law of

the forum state.   See Fed. R. Civ. P. 4(h)(1)(A).   New York law provides for service of process

on a corporation through New York's Secretary of State.   See N.Y. Bus. Corp. Law § 306(b)(1).

Master Group served Toner with the summons and Complaint through the New York Secretary

of State.   See Affirmation of Paula Lopez in Support of Request for Certificate of Default (Jan.

10, 2020) ¶ 3, DE # 6-1; Affidavit of Service (Jan. 10, 2020) at ECF p. 4, DE #6-2.

Accordingly, Master properly served Toner with the summons and Complaint.

## II.    The Four Contracts' Arbitration Provisions

The seventh paragraph of each of the Four Contracts includes an arbitration provision stating that "[a]ll controversy or claim [sic] arising out of or relating to this Agreement, or the breach, termination, validity or invalidity thereof, shall be determined by arbitration administered by the 'Hong Kong International Arbitration Center' (the 'HKIAC')."   See Four Contracts. Because Master Group did not reference these arbitration provisions in its initial motion papers, this Court ordered plaintiff to file supplemental papers addressing the impact of these provisions on this suit.   See 6/24/20 M&O at 2-3 (noting the strong federal policy in favor of arbitration).

Master Group now contends that the "arbitration provision in the contracts does not prevent this Court from entering a default judgment against Toner."   Pl. Supp. Mem. at 8. First, plaintiff argues that these arbitration provisions are akin to forum selection clauses, which do not affect this Court's subject matter jurisdiction.   See id. at 7.   Plaintiff is correct insofar as "enforcement of a forum selection clause is not jurisdictional, [so] enforcement of a provision compelling arbitration does not implicate the Court's subject matter jurisdiction."   Am. E Grp. LLC v. Livewire Ergogenics Inc., 432 F.Supp.3d 390, 399-400 (S.D.N.Y. 2020) (citing cases); see City of Benkelman v. Baseline Eng'g Corp., 867 F.3d 875, 880 (8th Cir. 2017) (holding that "an arbitration agreement alone" does not "divest [ ] the federal court[] of subject matter jurisdiction").   Multiple courts in this Circuit have ruled that an order compelling arbitration does not divest a district court of jurisdiction over the underlying case.   See, e.g., Bancol Y Cia. S. En C. v. Bancolombia S.A., 123 F.Supp.2d 771, 772 (S.D.N.Y. 2000) (citing The Anaconda v. Am. Sugar Ref. Co., 322 U.S. 42, 44 (1944)).

Master Group also contends that the inclusion of an arbitration provision in each of the

Four Contracts serves as a contractual clause that can be waived, and that Toner's default in appearing and responding to the Complaint waived any right Toner had to compel arbitration. See Pl. Supp. Mem. at 8 (citing cases).   While the presumption in favor of arbitration is strong, it is well-settled that "the obligation to arbitrate nevertheless remains a creature of contract[,]" Louis Dreyfus Negoce S.A. v. Blystand Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001), and "under a variety of circumstances one party may waive or destroy by his conduct his right to insist upon arbitration[,]" Baker & Taylor, Inc. v. AlphaCraze.Com Corp., 602 F.3d 486, 490 (2d Cir. 2010) (citation omitted).   Although the parties both agreed to submit to HKIAC arbitration any disputes relating to the shipments arising out of the Four Contracts, Master Group then commenced the instant suit so as to adjudicate this matter in federal court.   Rather than moving to compel arbitration, Toner chose to default, thereby waiving its right to insist upon arbitration.

## III.   Choice of Law – General Legal Principles

This Court has jurisdiction in this case pursuant to 28 U.S.C. § 1332, based on the diversity of the parties and the amount in controversy.   A federal district court sitting in diversity applies the substantive law of the forum state in which it sits, including that state's choice-of-law rules.   See Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1538-39 (2d Cir. 1997).   Since this action was brought in the Eastern District of New York, New York choice-of-law principles govern.   Cf. Crescent Oil & Shipping Servs., Ltd. v. Phibro Energy, Inc., 929 F.2d 49, 52 (2d Cir. 1991).   As a general rule, courts (including New York courts) "decide the applicable law for each issue separately."   Dwyer v. Deutsche Lufthansa, AG, 04-CV-3184 (TCP), 2006 WL 8441024, at *2 (E.D.N.Y. Dec. 18, 2006) (citing Krauss v. Manhattan

Life Ins. Co. of N.Y., 643 F.2d 98, 100 (2d Cir. 1981)); see also Retained Realty, Inc. v. McCabe, 376 F.App'x 52, 57 (2d Cir. 2010) (citing Restatement (Second) of Conflicts of Law § 188 cmt. d (1971)); Futurology Impex Corp. v. Int'l Trade Grp., Inc., No. CV 85-2357 (RJD), 1987 WL 42986, at *1 (E.D.N.Y. Dec. 18, 1987).

In New York, the first question to resolve in determining whether to undertake a choice-of-law analysis as to a particular issue is whether there is an actual conflict of laws. See Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc., No. 02 CV. 7666(LBS), 2005 WL 1123735, at *1 (S.D.N.Y. May 11, 2005) (citation omitted). Courts in this Circuit have held that an actual conflict is one that could "have a significant possible effect on the outcome of the trial[,]" and that "[w]here there is no actual conflict between the potentially applicable bodies of law, the court should dispense with the choice of law analysis and apply the law of the forum [state], . . . even when a dispute is governed by a contract containing a choice of law provision." Id. (citations omitted); see also Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005). New York law requires "that [the] party wishing to apply the law of a foreign state show how that law differs from the forum state's law[,] [and] [f]ailure to do so results in the application of New York law." USHA Holdings, LLC v. Franchise India Holdings, Ltd., 12 CV 3492 (KAM), 2015 WL 13741743, at *8 (E.D.N.Y. Sept. 11, 2015) (citing Haywin Textile Prods., Inc. v. Int'l Fin. Inv. & Commerce Bank Ltd., 152 F.Supp.2d 409, 413 (S.D.N.Y. 2001)), adopted, 2015 WL 5719647 (E.D.N.Y. Sept. 29, 2015).

## IV. Liability

If a defendant defaults and the plaintiff moves for default judgment, a court "is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its

12

favor[.]"   Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) (citation omitted).

Additionally, "a party's default is deemed to constitute a concession of all well pleaded

allegations of liability[.]"   Greyhound Exhibitgroup, Inc., 973 F.2d at 158; see Morales v. B&M

Gen. Renovation Inc., 14-cv-7290 (MKB) (MDG), 2016 WL 1266624, at *2 (E.D.N.Y. Mar. 9,

2016), adopted, 2016 WL 1258482 (E.D.N.Y. Mar. 29, 2016).

"Nevertheless, it remains for the court to consider whether the unchallenged facts

constitute a legitimate cause of action, since a party in default does not admit conclusions of

law." LaBarbera v. ASTC Labs, Inc., 752 F.Supp.2d 263, 270 (E.D.N.Y. 2010) (citation and

internal quotation marks omitted); see also 10A Charles A. Wright et al., Federal Practice &

Procedure: Civil § 2688.1 (3d ed. 2017) ("Once the default is established, defendant has no

further standing to contest the factual allegations of plaintiff's claim for relief. Even after default,

however, it remains for the court to consider whether the unchallenged facts constitute a

legitimate cause of action, since a party in default does not admit conclusions of law.").   In other

words, since the defaulting defendant has not admitted any legal conclusions, the plaintiff "must

establish that on the law it is entitled to the relief it seeks, given the facts as established by the

default." Finkel v. Triple A Grp., Inc., 708 F.Supp.2d 277, 280 (E.D.N.Y. 2010) (citation

omitted); see Lyons P'ship, 702 F.Supp.2d at 111.   If the elements of the claim are established

by the complaint's factual allegations, the defendant's default establishes its liability.   See Trans

World Airlines, Inc. v. Hughes, 449 F.2d 51, 69 (2d Cir. 1971), rev'd on other grounds, 409 U.S.

363 (1973).

The Complaint at issue contains causes of action for breach of contract, non-payment for

goods sold and delivered, and account stated.   See generally Compl.   The Court will address

each of these causes of action in turn.

## A. Breach of Contract

### 1. Choice of Law

Here, each of the Four Contracts includes a choice-of-law provision, providing, in pertinent part, that each "Agreement shall be construed and regulated pursuant to the current law of Hong Kong[.]"  See Four Contracts.   As this Court observed in its June 24th Memorandum and Order, "while Master Group asserts that, in light of the language negotiated by the parties, Hong Kong law should apply, it cites no authority for the proposition that Hong Kong and New York law are identical, and crucially, the operative pleading expressly asserts at least one cause of action under *New York* law (i.e., NYUCC), rather than Hong Kong law."  6/24/20 M&O at 4 (emphasis in original).   Now, plaintiff argues that it is proper for this Court to apply New York substantive law with respect to Master Group's first two causes of action (for breach of contract and goods sold and delivered) because the applicable laws of these two jurisdictions are "substantively the same."  See Pl. Supp. Mem. at 19.[14]

Turning first to Master Group's breach of contract claim, see Compl. ¶¶ 84-93, Master Group relies heavily on its initial submission for the proposition that there is no material conflict between Hong Kong and New York law.   See Pl. Supp. Mem. at 19 ("As to which law to apply to Master Group's breach of contract . . . [claim,] it is submitted that as discussed . . . below, and in [plaintiff's initial memorandum of law,] the laws are substantively the same.").   Upon review of the laws of both jurisdictions, this Court finds there to be no substantive conflict, and will

---

[14] Because plaintiff's second cause of action is pled in the alternative, see Pl. Supp. Mem. at 22, this Court's recommendation that Master Group recover for breach of contract, if adopted by the District Court, obviates the need to conduct a choice-of-law analysis on the second claim.

apply New York law in evaluating this cause of action.

Specifically, to prevail on a breach of contract claim under Hong Kong law, a plaintiff must establish (1) that there were express or implied contractual terms requiring the defendant to act in some manner, and (2) that the defendant has acted contrary to those express or implied terms.  See Willcox v. Lloyds TSB Bank, PLC, Civ. No. 13-00508 ACK-RLP, 2016 WL 593458, at *5 (D. Haw. Feb. 11, 2016) (citing Hongkong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd., [1962] 2 QB 26 (CA)).   Master Group contends that under Hong Kong law, such a breach:

> occurs when a party to a contract repudiates or fails to perform the contractual obligations, when a party fails to perform its obligation by the time fixed for performance by the contract, or when a party indicates that it will not perform its obligations under the contract.   In such instances, the non-breaching party may treat the contract as discharged and recover damages as a result of the losses caused by the breach.

See Pl. Mem. at 5-6 (citing §§ 24-035 and 26-001 of Chitty on Contract, 33d ed.); Additional Hong Kong Legal Authorities at ECF pp. 305-308 (discussing failure of performance under a contract as well as damages for that cause of action).   By comparison, the elements of a cause of action for breach of contract under New York law are: (1) the existence of a contract; (2) performance of a contract by one party; (3) breach by the other party; and (4) damages suffered as a result of the breach.   See Beautiful Jewellers Private Ltd. v. Tiffany & Co., 438 F.App'x 20, 21-22 (2d Cir. 2011).

Because the requirements of a breach of contract claim under the laws of both jurisdictions are substantially similar, the Court is persuaded that there is no substantive conflict between Hong Kong and New York law.   Absent such a conflict, this Court must bypass the choice-of-law analysis and apply New York law, even though the Four Contracts display choice-

of-law provisions.   See Blue Ridge Farms, Inc. v. Crown Equip. Corp., No. 01 CV 8460SJ, 2005 WL 755756, at *9 (E.D.N.Y. Mar. 28, 2005) ("In the absence of a 'material conflict' a court should bypass choice of law analysis and apply New York law . . . , even when a dispute is governed by a contract containing a choice of law provision.") (citations omitted).   In any event, in New York, "it is required that a party wishing to apply the law of a foreign state show how that law differs from the forum state's law[;] [f]ailure to do so results in the application of New York law."   Indep. Order of Foresters v. Donaldson, Lufkin & Jenrette Inc., 919 F.Supp. 149, 152 (S.D.N.Y. 1996) (citing cases).   When that foreign state is a common law state – as is Hong Kong – "courts assume that the foreign law is the same as New York's law."   Id. (citing Loebig v. Larucci, 572 F.2d 81, 85 (2d Cir. 1978)).   For all of these reasons, this Court finds no conflict-of-law with respect to Master Group's breach of contract claim, and applies New York law in evaluating the elements of this cause of action.

### 2.  First Element: Existence of Enforceable Contracts

As to the first element – the existence of a contract – the Complaint alleges, and the invoices and other documents proffered by plaintiff reflect, that the parties entered into a series of contracts under which Master Group agreed to supply various types of cookware to defendant at agreed-upon prices.   See Compl. ¶¶ 12-75.   Nevertheless, although each of the Four Contracts was signed by a representative of Master Group, none is signed by Toner.   See Four Contracts; see also 6/24/20 M&O at 7 (ordering Master Group to provide fully-executed copies of the parties' contracts or, in the alternative, explain why the Four Contracts, and the terms therein, remain actionable).   According to Master Group's supplemental submission, it does not have countersigned copies of the Four Contracts because, as part of the parties' usual course of

dealing, Toner never returned signed versions of these documents.   See Pl. Supp. Mem. at 10.

Ms. Zhao's supplemental declaration specifies that throughout Master Group's five years of

doing business with Toner, the parties followed the same general course of dealing when

entering into sales contracts: First, Toner would submit to Master Group, via email or text

message, a description of goods sought and the date by which the goods needed to be delivered.

See Supp. Zhao Decl. ¶ 7.   Then, in her capacity as a Master Group employee, Ms. Zhao would

prepare a sales contract with the agreed-upon terms, and email it to Toner.   See id. ¶¶ 7-9.   To

the extent that Toner would communicate any changes that needed to be made to a sales contract,

Master Group would make the modifications and email Toner a signed version of the revised

agreement.   See id. ¶ 9.   Although Toner would never sign the sales contracts sent by Master

Group, it purportedly expressed its agreement to the terms of the documents by initiating wire

transfers for the required security deposits, and emailing Master Group proof of those wire

transfers.   See id. ¶ 10.   Only upon receipt of the wired funds representing the contract deposit

due under a contract would Master Group commence the mass production of the custom-made

products ordered under the contract.   See id.   Ms. Zhao avers that this was the process followed

for each of the Four Contracts.   See generally id. ¶¶ 11-13.

Plaintiff is correct that under New York law, the Four Contracts are enforceable despite

not being signed by a representative of Toner.   Although the Statute of Frauds states that "a

contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is

some writing sufficient to indicate that a contract for sale has been made between the parties and

*signed by the party against whom enforcement is sought . . . ,*" NYUCC § 2-201(1) (emphasis

added), there is "[a]n exception . . . for merchants[15]: [w]hen merchants make an oral contract, they can enforce it as long as one of the merchants makes a 'writing in confirmation of the contract' in a 'reasonable time' and the other merchant did not object to the confirmation within ten days." H.Daya Int'l Co., Ltd. v. Arazi, 348 F.Supp.3d 304, 309 (S.D.N.Y. 2018) (quoting NYUCC § 2-201(2)).[16]

Because (1) Master Group emailed Toner signed copies of the Four Contracts containing the relevant terms of their agreements, (2) Toner paid initial deposits in the amounts stated in the Four Contracts through wire transfers referencing the sales contract numbers of each of the Four Contracts; (3) with final shipment of the goods, Master Group emailed Toner a packing list and commercial invoice for the goods shipped, and (4) Toner failed to object to the existence of any agreements within 10 days of receiving the sales contracts or after receiving the commercial invoices, these contracts are enforceable under New York law despite not being signed by Toner.[17]

---

[15] Master Group correctly notes that a merchant "is a person who deals in goods of the kind . . . ." See Pl. Supp. Mem. at 11 (quoting NYUCC § 2-104(1)). Additionally, the merchant exception to the Statute of Frauds (NYUCC § 2-201(2)) only applies to transactions "between merchants," defined as "any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants." NYUCC § 2-104(3). Based on the information in the pleading, this Court presumes that Master Group and Toner are both merchants that engaged in the types of transactions contemplated by these NYUCC provisions.

[16] Similarly, Master Group proffers Hong Kong authority indicating that these Contracts would likely be enforceable under Hong Kong law despite not being signed. See Pl. Supp. Mem. at 14 (citing Cap. 26, Sale of Goods Ordinance ("SOGO") § 5 ("[A] contract of sale may be made in writing . . . or by word of mouth, or partly in writing and partly by word of mouth, or may be implied from the conduct of the parties[.]")). Because Hong Kong law recognizes the existence of a contract based on the conduct of the parties, no substantive conflict of law exists with respect to the enforceability of an unsigned contract.

[17] Even assuming arguendo that Master Group did not satisfy NYUCC § 2-201(2), partial performance of the contract by the parties evidences the creation of an enforceable contract with respect to "goods . . . which have been received and accepted[.]" Pl. Supp. Mem. at 13 (citing, inter alia, NYUCC § 2-
(footnote continues)

### 3.   Remaining Elements of Breach of Contract Claim

Plaintiff has also sufficiently pled that it performed its contractual obligations under the Four Contracts by timely delivering the agreed-upon cookware to Toner's designated delivery agent in New York, see Compl. ¶ 76; see also Zhao Decl. ¶ 37, thereby satisfying the second element of its breach of contract claim.   With respect to the third element, Toner materially breached the Four Contracts by failing to pay the outstanding balances despite Master Group's repeated request for payment.   See Compl. ¶¶ 79-80; see also Zhao Decl. ¶¶ 34-36.[18]   Lastly, as to the fourth element of the first claim, and as detailed in the Damages section of this opinion, plaintiff has sufficiently pled that Master Group has suffered actual damages in the amount of the unpaid balance, together with contractual late fees.   See Compl. ¶ 93; see also Supp. Zhao Decl. ¶ 21.

Having alleged each element of the first cause of action, Master Group has established its claim for breach of contract under New York law.

## B.  Other Causes of Action

The pleading also seeks to recover for the non-payment of "goods sold and delivered" under the NYUCC, see Compl. ¶¶ 94-103, and for account stated, see id. ¶¶ 104-109.   As noted in this Court's July 24, 2020 Memorandum and Order, Master Group's initial moving papers

---

201(3)(c)).   Master Group's supplemental submission explains that the contracts were F.O.B. Shenzhen, meaning that the goods were received by Toner once they were delivered and placed on board the ship tasked with transporting the goods to New York.   See id.   Because Toner paid the contract deposits set forth in each of the Four Contracts and received and accepted the goods, the Four Contracts are enforceable despite the lack of Toner's signature.

[18]  According to the Second and Third Contracts, the balance of the total purchase price, after payment of the initial deposit, was due against the copy of the bill of lading; see Second Contract; Fourth Contract, and, with respect to the First and Fourth Contracts, "within 15[ ]days when container were [sic] on board[,]" First Contract; Fourth Contract.

omitted "discussion of whether the three causes of action set forth in the Complaint are duplicative of one another under Hong Kong [or] New York . . . law."  6/24/20 M&O at 4. Courts applying New York law have held that a plaintiff that prevails on its common law breach of contract claim cannot, in connection with the same allegations of failure to pay money owed, be found liable on claims for account stated and goods sold and delivered.  See id. at 4-5 n.5 (citing cases); see also Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995) (holding that a plaintiff seeking compensation for the same injury under different legal theories is entitled to only one recovery) (citing Wickham Contracting Co. v. Bd. of Educ., 715 F.2d 21, 28 (2d Cir. 1983)).

Master Group now contends that its three causes of action were pled "alternatively, not cumulatively," and concedes that it is "not entitled to recover on multiple claims in connection with Toner's failure to pay the balance due on the four sales contracts."  Pl. Supp. Mem. at 22. In light of this clarification, and because this Court has already recommended that Master Group recover losses associated with the Four Contracts under a theory of breach of contract, see supra Part IV.A, this Court does not reach the question of whether its allegations relating to the Four Contracts also establish liability on either of the other claims.

While plaintiff states that it does not seek a duplicative judgment under its first two causes of action, it nevertheless argues that Toner can be held liable on an account stated claim for the $1,200.00 balance due under the Debit Note.  See id. at 22-23.  For that reason, this Court must now assess whether Master Group has sufficiently alleged an account stated claim with respect to the Debit Note.

Because the Debit Note "is silent as to the applicable law," Pl. Mem. at 4; see also

20

6/24/20 M&O at 4 n.4, the first issue concerns whether to apply New York or Hong Kong law to this cause of action.   Nevertheless, for the reasons discussed below, the account stated claim fails under both Hong Kong and New York law; therefore, a choice-of-law analysis with respect to this claim would be entirely academic.

Plaintiff's recent submission concedes that "an account stated claim under that [sic] facts herein would not be actionable under Hong Kong Law" because "[a]n account stated claim in Hong Kong requires a showing that the amount which the plaintiff is seeking to recover is based on an offset of mutual debts between the parties[,]" whereas "Master Group was never indebted to Toner so no offset would be available, and such a claim could not be asserted[.]"   Pl. Supp. Mem. at 23.

Plaintiff's third cause of action likewise is defective under New York law, but for a different reason.   Under New York law, "such a claim requires an agreement between the parties to an account based upon prior transactions between them . . . ."   LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 64 (2d Cir. 1999) (internal quotation marks and citation omitted).   "Such an agreement [to pay] may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time[.]"   Id. (internal quotation marks and citation omitted).   Here, however, the record reflects that Toner did in fact object to the portion of Master Group's account reflecting the Debit Note's unpaid balance of $1,200.00 for the shipment of whisks; Toner responded in September 2018 that it had already transferred funds to Master Group to satisfy the $1,200 balance.   See Ex. 3 to Supp. Zhao Decl., DE #14-3 at ECF pp. 1. ("[W]e also paid you $1,200 for the whisks. Please see both wire proofs attached[.]").   Under these circumstances, Toner cannot be said to have agreed, either expressly

21

or implicitly, to the account stated by Master Group, and the claim for the balance alleged to be due under the Debit Note must therefore fail.[19]  See, e.g., Abbott, Duncan & Wiener v. Ragusa, 214 A.D.2d 412, 413 (1st Dep't 1995) (affirming denial of plaintiff's motion for summary judgment on an account stated theory, in light of evidence showing that defendant disputed the amount billed).

## V.    Damages

Though defendant, by defaulting, admits all well-pleaded allegations pertaining to liability, the Court has discretion to determine whether plaintiff has substantiated its damages request.  See Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC, 779 F.3d 182, 189 (2d Cir. 2015).  Under New York law, damages for breach of contract "attempt[] to secure to the injured party the benefit of his bargain, subject to the limitations that the injury . . . was foreseeable, and that the amount of damages claimed be measurable with a reasonable degree of certainty and, of course, adequately proven." Terwilliger v. Terwilliger, 206 F.3d 240, 248 (2d Cir. 2000) (quoting Freund v. Wash. Sq. Press, Inc., 34 N.Y.2d 379, 382 (1974)).  "[F]undamental" to this analysis is "that the injured party should not recover more from the breach than he would have gained had the contract been fully performed."  Id.

Master Group has proffered the Four Contracts and invoices itemizing the prices that were agreed upon by the parties, as well as the limited payments made by defendant.  Based on the allegations in the Complaint and this documentary evidence, the Court respectfully

---

[19]  The law is clear that on a motion for default, a fact is not "well-pleaded" where, as here, it is "contrary to uncontroverted material in the file of the case."  Lelchook v. The Islamic Republic of Iran, 393 F.Supp.3d 261, 264-65 (E.D.N.Y. 2019) (citation omitted).

recommends that Master Group be awarded the balance due under the Four Contracts ($506,015.14).

Plaintiff also seeks a contractual daily late fee in the sum of 0.01 percent of the balance due on the Four Contracts.    See Compl. *ad damnum* clause; [Second] Proposed Order (July 15, 2020), DE #14-6 at ECF p. 1.[20]    Each of the Four Contracts provides that "[i]f the buyer does not fulfill his contractual promise to deliver payment on time, the buyer is responsible for a daily overdue payment of 1/1000 of the total agreed payment."  Four Contracts ¶ 5.    Addressing the date from which this daily late fee should be calculated, Master Group notes that Toner's obligations to pay the balance under the Four Contracts arose on four different dates: (1) on or about November 18, 2018 for the Third Contract; (2) on November 28, 2018 for the First Contract; (3) on or about December 9, 2018 for the Second Contract; and (4) on December 24, 2018 for the Fourth Contract.    See Pl. Supp. Mem. at 5.    But rather than calculating the daily late fees from each of these due dates, plaintiff submits that the daily late fee should begin on December 24, 2018, which is the purported date that the balance became due on the Fourth Contract, the last shipment to be sent by Master Group.    See id.[21]    Because the late fee calculated from the December 24th date would be *less* than the late fee calculated from each of the four dates listed above, this Court adopts Master Group's proposed start date, and

---

[20] As this Court noted in its June 24th Memorandum and Order, plaintiff incorrectly sought a contractual daily late fee on the total sum that Master Group claimed to be owed, despite the fact that the Debit Note did not provide for a daily late fee.    See 6/24/20 M&O at 5.    Master Group then clarified that it was not seeking a daily late fee of 0.01 on the Debit Note.    See, e.g., Pl. Supp. Mem. at 27; see also [Second] Proposed Order, DE #14-6 at pp. 1-2.    In any event, as explained above, Master Group's claim based on the Debit Note is defective.

[21] The Complaint erroneously lists the Fourth Contract's payment due date as December 24, 2019, rather than December 24, 2018.    See Compl. ¶ 68.    Master Group's supplemental submission clarifies that this provision "was a typo and should read December 24, 2018."  Pl. Supp. Mem. at 5.

respectfully recommends that the District Court award plaintiff $506,015.14, plus a daily late fee of 0.01 percent, to be calculated from December 24, 2018 through the date of final entry of judgment.

## VI.    Interest

Plaintiff also requests pre- and post-judgment interest.   See [Second] Proposed Order, DE #14-6 at p. 1; see also Compl. *ad damnum clause*.

### A.  Pre-Judgment Interest

"Under New York law, 'prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract.'"   Graham v. James, 144 F.3d 229, 239 (2d Cir. 1998) (quoting Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2d Cir. 1984)); see also N.Y. C.P.L.R. § 5001(a).[22]  Pre-judgment "[i]nterest [is] computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred."   See N.Y. C.P.L.R. § 5001(b).   "Where, as here, damages are incurred at various times after the cause of action accrues, it is within the discretion of the district court to determine a reasonable date from which to calculate the interest."   Gerritsen v. Glob Trading, Inc., No. 06-CV-3756 (SLT)(RLM), 2009 WL 262057, at *12 (E.D.N.Y. Feb. 4, 2009) (citation and internal quotation marks omitted).   Pursuant to New York law, pre-judgment interest is

---

[22] Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), a federal court sitting in diversity applies federal procedural law but the forum state's substantive law.   The availability of pre-judgment interest is considered a substantive rather than a procedural issue.   See Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999).   In determining whether Hong Kong or New York's laws should govern the availability of pre-judgment interest, "New York choice of law principles dictate that the law of the jurisdiction whose law determined liability controls also the allowance of pre-judgment interest." Schwartz v. Twin City Fire Ins. Co., 492 F.Supp.2d 308, 323 (S.D.N.Y. 2007), aff'd sub nom. Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135 (2d Cir. 2008).   Because, as Master Group requested, New York law has been applied to determine liability with respect to Master Group's breach of contract cause of action, New York law should likewise determine the availability of pre-judgment interest on that claim.

computed at a rate of nine percent per year.   See N.Y. C.P.L.R. § 5004.

As this Court noted in its July 24th Memorandum and Order, it was not clear from the pleading whether Master Group was seeking an award of pre-judgment interest as well as a contractual daily late fee of 0.01 percent, because the Complaint's *ad damnum* clause omits reference to pre-judgment interest, and only requests the contractual late fee.   See Compl. *ad damnum* clause; see also 6/24/20 M&O at 5-6 (noting the same).   Master Group now clarifies that it seeks both a contractual late fee on the amount owed pursuant to the Four Contracts as well as pre-judgment interest, to be calculated from December 24, 2018 through the date of final entry of judgment.   See Pl. Supp. Mem. at 27.   For the reasons that follow, plaintiff has failed to establish its entitlement to such relief.

In light of the fact that the Complaint's *ad damnum* clause omits reference to pre-judgment interest, and only requests the contractual daily late fee of 0.01 percent, see Compl. *ad damnum* clause, this Court observed in its June 24th Memorandum and Order:

> To the extent that Master Group now seeks an interest award that it did not seek in the Complaint, such relief may be impermissible insofar as a default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.

See 6/24/20 M&O at 6 (citing Silge v. Merz, 510 F.3d 157, 160-161 (2d Cir. 2007) (affirming the denial of pre-judgment interest in connection with the entry of default judgment where plaintiff did not expressly seek statutory pre-judgment interest in the prayer in his complaint)). Plaintiff now acknowledges the Second Circuit's holding in Silge, but argues that "Toner had sufficient notice of Master Group's intent to recover pre-judgment interest to satisfy" Rule 54(c) of the Federal Rules of Civil Procedure because "the second and third cause[s] of action [informed] Toner that Master Group would be seeking to recover interest."   Pl. Supp. Mem. at

25

26-27.

This argument is unpersuasive for a host of reasons.   First, plaintiff does not cite to any case law so as to distinguish Silge or its progeny, and for this reason alone, plaintiff has failed to demonstrate that it is entitled to pre-judgment interest.   See id. at 27.   In any event, plaintiff's supplemental papers do not address two issues that this Court identified in its June 24th Memorandum and Order: (1) while the Complaint's Second and Third Causes of Action (under the NYUCC and for account stated, respectively) request an unspecified form of "interest[,]" see Compl. ¶¶ 103, 109, neither provision states whether this interest is pre- or post-judgment; and (2) for some unexplained reason, the Complaint's First Cause of Action (for breach of contract) – the theory upon which Master Group seeks a judgment based on the Four Contracts – fails to request this relief, see generally 6/24/20 M&O at 6.   Therefore, to the extent Toner was on notice that Master Group sought "interest" in the pleading, it is not altogether clear whether this interest was of the pre- or post-judgment variety (or, for that matter, the contractual daily late fee), or the cause or causes of action upon which this interest was sought.

Even assuming *arguendo* that the Complaint properly sets forth a request for pre-judgment interest, Master Group has not demonstrated that it can permissibly recover both statutory pre-judgment interest and a contractual late fee under New York law.   Recent case law in this Circuit has held that "[t]o permit [a contractual late fee and statutory pre-judgment interest] would be to allow duplicative compensation for the delay in Plaintiff receiving its owed payment."   Voice Tele Servs. Inc. v. Blue-Dot Telecoms Ltd., 19-CV-5252 (JKG) (OTW), 2019 WL 6497507, at *3 (S.D.N.Y. Dec. 2, 2019).   While Master Group's supplemental submission "acknowledges that there is inconsistency in the courts as to whether an award of late fees **and**

26

pre-judgment interest . . . are recoverable[,]" Pl. Supp. Mem. at 24 (citing cases) (emphasis in original), it ultimately "defer[s] to the Court's sound discretion in deciding whether such an award is appropriate[,]" id. (citing cases).   But Master Group does nothing to distinguish this case from those in which pre-judgment interest and contractual late fees were deemed unrecoverable, nor does it address whether an award of a contractual late fee and pre-judgment interest could be construed as a double recovery.   For these reasons, and because Master Group's breach of contract claim does not even reference pre-judgment interest, this Court is not persuaded that Master Group can recover both forms of relief, and recommends that the District Court decline to award Master Group statutory pre-judgment interest.

### B. Post-Judgment Interest

As to post-judgment interest, which is governed by federal statute, 28 U.S.C. § 1961(a), see Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008), "an award of post-judgment interest is mandatory," and is calculated at the statutory rate prescribed by 28 U.S.C. § 1961(a), see MRC Indus., Inc. v. Global Therapy Sys., LLC, No. 06-CV-3633 (JS)(WDW), 2009 WL 2461106, at *4 (E.D.N.Y. Aug. 7, 2009) (citing Schipani, 541 F.3d at 165).

Accordingly, this Court respectfully recommends that Master Group be awarded post-judgment interest on its monetary award, to be calculated using the federal rate set forth in 28 U.S.C. § 1961(a), from the date the Clerk of the Court enters judgment in this action until the date of payment.

## VII.    Attorneys' Fees and Costs

Plaintiff also requests that this Court award "costs, inclusive of attorney's fees[.]" [Second] Proposed Order, DE #14-6 at p. 2; see also Pl. Supp. Mem. at 16-19.   Master Group's

initial moving papers failed to state whether this Court should apply New York or Hong Kong

law with respect to its application for fees.   <u>See</u> Pl. Mem. at 14-15.   Rather, plaintiff noted a

conflict in the laws of New York and Hong Kong, stating that under the former, Master Group

would not be entitled to recover fees, which are the ordinary incidents of litigation and may not

be awarded to the prevailing party unless authorized by agreement between the parties, statute, or

court rule, whereas the latter allows a plaintiff to recover fees as part of an award of costs.   <u>See</u>

<u>id.</u> (citations omitted).   Master Group now seeks "to invoke the choice of law provision

contained in the [Four] [C]ontracts" so as to obtain an award of fees.   <u>See</u> Pl. Supp. Mem. at 16;

<u>id.</u> at 19 ("[T]here is no prejudice to Toner in having this Court enforce the choice of law

provision, and apply Hong Kong law in awarding Master Group attorney's fees, based on the

parameters permitted by Hong Kong law.").[23]

### A.  Choice of Law

To determine whether New York or Hong law governs Master Group's motion for fees,

this Court "must consider two conceptually distinct issues":

> First, a federal court exercising diversity jurisdiction must apply the choice-of-law rules
> of the state in which the court sits to determine the rules of decision that would apply if
> the suit were brought in state court . . . [and] [s]econd, after using state conflict-of-laws
> principles to ascertain the rules of decision that would apply in the state courts of the
> federal forum, federal courts apply those state rules of decision that are 'substantive'
> under [<u>Erie Railroad Company v. Tompkins</u>, 304 U.S. 64 (1938)], and are consistent with
> federal law."

<u>Ancile Inv. Co. v. Archer Daniels Midland Co.</u>, 992 F.Supp.2d 316, 318 (S.D.N.Y. 2014)

(citations and internal quotation marks omitted).   Here, because there is a conflict between New

---

[23] Master Group did not address whether, and if so how, it could purportedly obtain attorneys' fees
pursuant to the Debit Note, <u>see</u> [Second] Proposed Order, DE #14-6 at p. 2, which lacks a choice-of-law
provision.   In any event, Master Group has not pled a viable claim based on the Debit Note.

York and Hong Kong law, this Court must first apply New York choice-of-law rules to determine whether a New York court would apply Hong Kong or New York law to the fee issue, a determination that turns on whether the resulting "rule of decision would be considered 'substantive' by New York courts" (as opposed to procedural); then the Court must consider whether, in exercising diversity jurisdiction, the Court should, in accordance with Erie, apply the resulting rule of decision.  See Deutsche Bank Tr. Co. v. Am. Gen. Life Ins. Co., No. 1:15-CV-3869-GHW, 2016 WL 5719783, at *13 (S.D.N.Y. Sept. 30, 2016), aff'd sub. nom. Deutsche Bank Tr. Co. Americas v. Serengeti Opportunities MM LP, 707 F.App'x 741 (2d Cir. 2017).

## B.  Plaintiff's Request for Fees

Although Master Group admits that the "trend under New York law [is] to treat the issue of an award of . . . fees as procedural and not substantive[,]" it asks this Court to ignore that line of precedent and find that the fee in the instant action is substantive under New York law.  See Pl. Supp. Mem. at 17 (citing cases).  This Court declines to do so.  As an initial matter, in assessing the substance-procedure distinction, New York courts take into account "policy considerations relating to predictability, fairness, and efficient judicial administration[,]" Ancile Inv., 992 F.Supp.2d at 319, and rely heavily on the parties' expectations, see, e.g., id. at 320. Here, while the parties agreed to each of the Hong Kong choice-of-law provisions in the Four Contracts, none of the Four Contracts includes language that the losing party is responsible for another litigant's fees.  As the Second Circuit declared in affirming the District Court's decision in the Deutsche Bank case (which held that New York's prohibition on attorney fee shifting is procedural under New York law): "As a matter of public policy, New York prohibits courts from inferring that parties have agreed to fee shifting 'unless the intention to do so is unmistakably

clear from the language' of the contract."  <u>Deutsche Bank</u>, 707 F.App'x at 742 (citation omitted).

Crucially, plaintiff's supplemental brief fails to address either party's expectations with respect to attorneys' fees; rather, relying on a 20-year old Southern District of New York decision, <u>Katz v. Berisford International PLC</u>, No. 96 CIV. 8695 (JGK), 2000 WL 959721, at *8 (S.D.N.Y. July 10, 2000), plaintiff argues for a "significant contacts analysis[.]"  <u>See</u> Pl. Mem. at 17, 18.  Plaintiff claims that this approach counsels in favor the application of Hong Kong law because, in pertinent part, (1) "Master Group is a company based in Hong Kong," (2) Master Group prepared the contracts in Hong Kong," and (3) "the payment from Toner to Master Group was to be received in Hong Kong through wire transfer."  <u>Id.</u> at 18.  But this case does not involve the same level of contacts with the foreign jurisdiction as in <u>Katz</u>,[24] and the parties' contacts with New York are such that this Court cannot presume that Toner expected fees to be awarded pursuant to the laws of Hong Kong.  <u>See, e.g.</u>, Compl. ¶¶ 6, 76, 78 (noting that Toner is a New York-based corporation that maintains its principal office in Brooklyn, the goods at issue in this case were delivered to Toner's agents in New York, and payment was in American, not Hong Kong, dollars).  More importantly, <u>Katz</u> predated the Second Circuit's decision in <u>Deutsche Bank</u>, which affirmed a decision declining to apply the English fee-shifting rule.  <u>See also</u> <u>Atomi, Inc. v. RCA Tradmark Mgmt., SAS</u>, No. 14-CV-7456 (VEC), 2015 WL 1433229, at *5 (S.D.N.Y. Mar. 30, 2015) ("Given New York's policy [against fee shifting], applying the French [fee-shifting] rule would be contrary to a 'fundamental policy' of the forum; accordingly,

---

[24] While the kitchen cookware was sold by Master Group, a Hong Kong company, <u>see</u> Compl. ¶ 4, and shipped from that location to New York, <u>see id.</u> ¶ 10, the deals were apparently not "closed" in the foreign jurisdiction, nor is there any suggestion that the parties ever met in Hong Kong.  <u>See generally</u> Supp. Zhao Decl. ¶ 7.

the Court believes that a New York court would conclude that the rule is procedural.").   Finally, Master Group has made significant efforts to avail itself of a judicial decision in *this* jurisdiction, stressing in its supplemental brief that it has not moved to compel arbitration despite drafting and including arbitration clauses in each of the Four Contracts.   See Pl. Supp. Mem. at 7-10.

In light of the foregoing, and based on the facts of this case, this Court concludes that a New York court would view the question of attorneys' fees as procedural, not substantive, and thus would apply New York law, not Hong Kong law.   Under Erie, where, as here, "New York's law on this issue does not conflict with federal law, this Court must follow New York state law regarding entitlement to attorney's fees." Ancile Inv., 992 F.Supp.2d at 320; see Atomi, Inc., 2015 WL 1433229, at *5 (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 259 n.31 (1975)).[25]   Accordingly, plaintiff is not entitled to recover attorneys' fees in this action.[26]

---

[25] The Second Circuit has clarified that "[w]hether a particular state rule of decision is 'substantive' under Erie is a question of federal law" and, for Erie purposes, "it is 'immaterial' whether that state rule of decision is labelled by *state law* as 'procedural,' 'substantive,' both, or neither." Liberty Synergistics Inc. v. Microflo Ltd., 718 F.3d 138, 152 (2d Cir. 2013) (emphasis in original).   Therefore, a state's procedural rules under its own choice-of-law principles can be substantive for the purposes of federal diversity jurisdiction under Erie.   See Ancile Inv., 992 F.Supp.2d at 320 n.2 (citation and internal quotation marks omitted).   Indeed, "[b]ecause entitlement to fee shifting is viewed as *substantive* under Erie (as opposed to *procedural* under New York law), and New York's law on this issue does not conflict with federal law, [the] Court must follow New York state law regarding entitlement to attorney's fees." Id. at 320-321 (conducting an Erie analysis and applying the American rule to the movant's motion for fees) (emphasis in original).

[26] In any event, plaintiff has not submitted any time records or other documents that would allow this Court to make a fee determination.   Cf. E. Sav. Bank, FSB v. Rabito, No. 11 Civ. 2501 (KAM), 2012 WL 3544755, at *7 (E.D.N.Y. Aug. 16, 2012) ("[T]he court finds an inadequate factual basis for an award of attorneys' fees and costs because plaintiff submitted no contemporaneous time records or declarations regarding costs incurred during the course of this litigation.").   Moreover, the lawyering on Master Group's behalf resulted in a record riddled with errors and inconsistencies, thereby impeding the Court's ability to address the issues in an efficient manner.

### C. Plaintiff's Request for Costs

Master Group also seeks costs, consisting of $400.00 for the court filing fee and $15.00 relating to service of process.   See Supp. Zhao Decl. ¶ 25; [Second] Proposed Order, DE #14-6 at pp. 1-2.   In support of its application for costs, plaintiff has proffered receipts showing each of these expenditures.   See Ex. 5 to Supp. Zhao Decl. (Payment Confirmation) (July 15, 2020), DE #14-5 (noting a $400.00 filing fee and a $15.00 service of process fee).   Though there does not appear to be a conflict between New York and Hong Kong law with respect to costs (exclusive of attorneys' fees), see, e.g., Pl. Mem. at 14-15; Pl. Supp. Mem. at 17-18, these laws are not controlling here: in calculating costs, federal courts sitting in diversity look to Rule 54(d)(1) of the FRCP, which provides that "unless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party[,]" Fed. R. Civ. P. 54(d)(1); Baker v. Power Sec. Corp., 174 F.R.D. 292, 294 (W.D.N.Y. 1997) ("Except in rare circumstances in which some important state interest is implicated . . . the awarding of costs in an action in federal court is controlled by federal law, specifically Rule 54 and 28 U.S.C. §§ 1821 and 1920.").   Master Group is therefore entitled to reasonable costs relating to its filing fee and for service of process.   The Court respectfully recommends that costs in the amount of $415.00 be included in plaintiff's award.

### CONCLUSION

For the foregoing reasons, the undersigned magistrate judge respectfully recommends that plaintiff's motion for default judgment be granted in part and denied in part, and that plaintiff be awarded (1) compensatory damages, consisting of $506,015.14 due under the Four Contracts, along with a daily late fee of 0.01 percent on this sum, to be calculated from

December 24, 2018 through the entry of final judgment; (2) post-judgment interest pursuant to 28 U.S.C. § 1961(a); and (3) costs totaling $415.00.   Plaintiff should not be awarded $1,200 under the Debit Note or attorneys' fees.

Any objections to this Report and Recommendation must be filed with the Honorable Ann M. Donnelly on or before **August 27, 2020**.   Failure to file timely objections may waive the right to appeal the District Court's Order.   See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Master Group is directed to transmit copies of this Report and Recommendation to the defaulting defendant, via overnight Federal Express, at the following address, and file proof of service regarding the same:

TONER.COM INC.
163 Imlay Street
Brooklyn, New York, 11231

**SO ORDERED.**

**Dated:    Brooklyn, New York**
**         August 10, 2020**

/s/ *Roanne L. Mann*

**ROANNE L. MANN**
**CHIEF UNITED STATES MAGISTRATE JUDGE**